IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

MCIMETRO ACCESS TRANSMISSION
SERVICES OF VIRGINIA, INC., D/B/A
VERIZON ACCESS TRANSMISSION
SERVICES OF VIRGINIA,

                                        Plaintiff,

            v.

MARK C. CHRISTIE, in his official capacity as
Chairman of the State Corporation Commission
of Virginia,

                                                      Civil Action Number 3:06CV740

THEODORE V. MORRISON, JR., in his official
capacity as Commissioner of the State
Corporation Commission of Virginia,

and

JUDITH WILLIAMS JAGDMANN, in her
official capacity as Commissioner of the State
Corporation Commission of Virginia,

                                        Defendants.

## MEMORANDUM OPINION

THIS MATTER comes before the Court on the Motions to Dismiss filed by Defendants[1]

Mark C. Christie, Theodore V. Morrison, Jr., and Judith Williams Jagdmann, in their official

capacities, and Intervenors XO Communications Services, Inc., DIECA Communications, Inc.,

d/b/a Covad Communications Company, and Cavalier Telephone, LLC (collectively, the

---

[1]The State Corporation Commission of Virginia has been dismissed as a party to this lawsuit.

"Competitive Carrier Group" or "CCG").  For the reasons expressed below, the Motions to

Dismiss are GRANTED, and Plaintiff's Complaint is hereby dismissed with prejudice.

## I.

Plaintiff, MCImetro Access Transmission Services of Virginia, Inc., d/b/a Verizon

Access Transmission Services of Virginia ("Verizon Access"), is a local subsidiary of what was

formerly the national telecommunications service provider MCI, Inc.  Until January 6, 2006,

when Verizon Communications Inc. ("Verizon") concluded a merger that resulted in the

complete assimilation of MCI and its subsidiaries, MCI, a competitive local exchange carrier

("CLEC") and Verizon, an incumbent local exchange carrier ("ILEC"), were competitors in the

telecommunications marketplace.  Both entities provided wholesale special access services to

other telecommunications carriers, including the CLECs that comprise the Competitive Carrier

Group.  Special access provides dedicated telecommunications capacity between two points.  It is

often sold initially by one telecommunications carrier to another.  The buyer then uses the

additional capacity, in combination with its own facilities and facilities under other types of

agreements, to sell high capacity telecommunications services at retail.  Most services provided

over special access are ultimately sold to large and medium-sized business customers,

government agencies, and institutions.  When sold to end-users, special access services are

sometimes called "private line services."

Verizon and MCI sought permission to merge from the Federal Communications

Commission ("FCC"), the Department of Justice ("DOJ"), and various state agencies and

commissions, including the State Corporation Commission of Virginia ("SCC").  On October 6,

2005, the SCC issued an order consenting to Verizon's merger with MCI, but attached certain

conditions to minimize perceived anticompetitive effects.  Order Granting Approval, Joint

Petition of Verizon Communications Inc. and MCI, Inc. for Approval of Agreement and Plan of

Merger, Case No. PUC-2005-00051 (Va. SCC Oct. 6, 2005) ("First SCC Order").

One of those conditions restricts the terms, conditions, and rates under which Verizon

Access may offer special access in Virginia.  The SCC found "significant evidence in this case

on how the departure from the market of an independent MCI may ultimately impact the

provision of local services to Virginia customers, especially mid-size business customers that

rely upon T1/DS1 and greater connectivity."  Id. at 28.  Specifically, the SCC found evidence

that:

> (1) MCI provides high capacity services to other carriers in the mid-size
> business market; (2) one of the largest CLECs in Virginia, next to MCI and
> AT&T, purchases almost all of its non-Verizon high capacity transport from
> MCI; (3) for one of the largest CLECs in Virginia, next to MCI and AT&T,
> in more than 90% of the central offices where such CLEC purchases high
> capacity fiber transport from carriers other than Verizon, there is no
> alternative competitive supplier to Verizon or MCI of such transport; and (4)
> MCI currently offers lower prices than Verizon for transported loop services.

Id. at n.41.

Therefore, as a requirement of its approval to the merger, the SCC ordered MCI to

> continue to offer to wholesale customers in Virginia its available intrastate
> and interstate special access, private line or its equivalent, and high capacity
> loop and transport facilities, without undue discrimination, at pre-merger
> terms and conditions and at prices that do not exceed pre-merger rates. . . .
> until the Commission issues an order finding that such [requirement] is no
> longer necessary for [it] to be satisfied that removing MCI as an independent
> provider of these services will not impair or jeopardize adequate service to
> the public at just and reasonable rates.

Id. at 28–29.

Verizon and MCI subsequently obtained permission to merge from the FCC and DOJ, subject to certain conditions.  Memorandum Opinion and Order, Verizon Communications Inc. and MCI, Inc. Applications for Approval of Transfer of Control, 20 FCC Rcd 18433 (2005) ("FCC Order"); Final Judgment, United States v. Verizon Commc'ns Inc. and MCI, Inc., Case No. 1:05CV2103-EGS (D.D.C. filed Apr. 5, 2006).  One of the FCC conditions, addressing special access services, mandates that

> [f]or a period of thirty months following the Merger Closing Date, Verizon / MCI shall not increase the rates paid by MCI's existing customers (as of the Merger Closing Date) of the DS1 and DS3 wholesale metro private line services that MCI provides in Verizon's incumbent local telephone company service areas above their level as of the Merger Closing Date.

FCC Order at 18560.

On April 10, 2006, Verizon Access filed a petition with the SCC requesting the removal of its special access condition.  Verizon Access argued that the condition is no longer necessary because the DOJ and FCC "imposed their own requirements on Verizon [Access's] interstate and intrastate private line and special access services, designed to address the very same concerns about access and price that underlie the [SCC's] private line and special access requirement." Petition of MCImetro Access Transmission Services of Virginia, Inc., d/b/a Verizon Access Transmission Services of Virginia for Removal of Certain Provisions of the October 6, 2005 Order in Case No. PUC-2005-00051, Case No. PUC-2006-00057, at 2 (Va. SCC Apr. 10, 2006). Three months later, the SCC, satisfied that the challenged condition is both necessary and proper, issued an order denying Verizon Access's petition.  Order Denying Petition, Petition of MCImetro Access Transmission Services of Virginia, Inc., d/b/a Verizon Access Transmission Services of Virginia for Removal of Certain Provisions of the October 6, 2005, Order in Case

4

No. PUC-2005-00051, Case No. PUC-2006-00057 (Va. SCC July 10, 2006) ("Second SCC Order").

       This action followed.

## II.

       In its Complaint, Verizon Access alleges that the First and Second SCC Orders, as applied to regulate the rates, terms, and conditions under which Verizon Access may offer interstate special access service, and the Utility Transfers Act, Va. Code §§ 56-88 to 56-92, as construed to authorize those Orders, are preempted by federal law.  Verizon Access submits three arguments in support of its claim of preemption.  First, under the Communications Act of 1934 (the "Communications Act"), as amended by the 1996 Telecommunications Act (the "1996 Act"), the regulation of the rates, terms, and conditions of interstate telecommunications services is assigned exclusively to the FCC.  Second, the SCC's Orders conflict with the FCC's Hyperion Order, in which the FCC determined that the public interest would be better served if non-ILECs such as Verizon Access, could freely set their own rates, terms, and conditions for certain interstate telecommunications services, including interstate special access.  See Memorandum Opinion and Order and Notice of Proposed Rulemaking, Hyperion Telecommunications, Inc., Petition Requesting Forbearance, 12 FCC Rcd 8596 (1997).  Third, the SCC condition conflicts with the FCC's Order approving the merger of Verizon and MCI.

       The Defendants and the CCG have moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  The Defendants maintain that the SCC Orders are not preempted by the Communications Act, as amended by the 1996 Act, the Hyperion Order, or the FCC's Order approving the merger.  The CCG joins this argument, and adds that this action is barred by the

statute of limitations, or in the alternative, should be referred to the FCC under the primary jurisdiction doctrine.

The function of a motion to dismiss is to test the law governing claims, not the facts which support them.  See Conley v. Gibson, 355 U.S. 41, 45–46 (1957).  In deciding a motion to dismiss, a court must accept the plaintiff's allegations of facts as true.  Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp., 910 F.2d 139, 143 (4th Cir. 1990).  A motion to dismiss under Fed. R. Civ. P. 12(b)(6) should not be granted  "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley, 355 U.S. at 45–46.

As a threshold matter, the Court finds this action timely and properly before it.  Contrary to the arguments propounded by the CCG, the harm alleged by Verizon Access, namely the SCC's ongoing enforcement of the contested condition, is very much the type of "continuing course of conduct" recognized in National Advertising, as one that "'cannot be insulated by the statute of limitations.'"  See Nat'l Adver. Co. v. City of Raleigh, 947 F.2d 1158, 1167 (4th Cir. 1991) (quoting Virginia Hosp. Ass'n v. Baliles, 868 F.2d 653, 663 (4th Cir. 1989), aff'd sub nom. Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498 (1990)).  Moreover, it is unnecessary to refer this action to the FCC.  The issues raised in Verizon Access's Complaint fall squarely "within the conventional experience" of this Court.  Envtl. Tech. Council v. Sierra Club, 98 F.3d 774, 789 (4th Cir. 1996).

### III.

Pursuant to the Supremacy Clause, U.S. Const. art. VI, cl. 2, "state law that conflicts with federal law is 'without effect.'"  Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (quoting Maryland v. Louisiana, 451 U.S. 725, 746 (1981)).  "The purpose of Congress is the

ultimate touchstone" in preemption analysis. Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn, 375 U.S. 96, 103 (1963). The Supreme Court has recognized three general ways in which federal law may preempt, and thereby displace, state law: (1) "express preemption," which occurs when there is an explicit statutory command that state law be displaced; (2) "field preemption," which arises when "[t]he scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947); and (3) "conflict preemption," which occurs when state law is in actual conflict with federal law, or "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress," Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984). "Regulations duly promulgated by a federal agency pursuant to a Congressional delegation have the same preemptive effect as a legislative enactment." City of Charleston v. A Fisherman's Best, Inc., 310 F.3d 155, 169 (4th Cir. 2002).

Neither express preemption nor field preemption applies in this case. Indisputably, there is no express declaration by Congress or the FCC prohibiting state regulation of the conditions to the merger of Verizon and MCI. When these entities are of a mind to expressly preempt state action, they do so in a way that leaves little room for doubt. See, e.g., 47 U.S.C. § 253 (directing the FCC to preempt enforcement of state statutes, regulations, or legal requirements that prohibit or have the effect of prohibiting any entity from providing an interstate or intrastate telecommunications service); Memorandum Opinion and Order, Silver Star Telephone Company, Inc. Petition for Preemption and Declaratory Ruling, 12 FCC Rcd 15639 (1997) (preempting state law governing rural ILECs' protection from competition), recons. denied, 13 FCC Rcd 16356 (1998), aff'd, RT Comm'ns, Inc. v. FCC, 201 F.3d 1264 (10th Cir. 2000).

Moreover, there is no preemption in the area of special access lines in particular or the field of telecommunications in general.  Qwest Corp. v. Scott, 380 F.3d 367, 374 (8th Cir. 2004) ("Reading all of the FCC's pronouncements concerning special access services, including this most recent notice of rulemaking, we do not discern an intent of the Commission as yet to preclude all state regulation of these mixed-use services.").  Congress expressly included the states in its assignment of responsibility for regulating telecommunications.  In the words of the FCC,

> in enacting sections 251, 252, and 253, Congress created a regulatory system that differs significantly from the dual regulatory system it established in the 1934 Act.  That Act generally gave jurisdiction over interstate matters to the FCC and over intrastate matters to the states. The 1996 Act alters this framework, and expands the applicability of both national rules to historically intrastate issues, and state rules to historically interstate issues.  Indeed, many provisions of the 1996 Act are designed to open telecommunications markets to all potential service providers, without distinction between interstate and intrastate services.

First Report and Order,  Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 FCC Rcd 15499, 15544 (1996), vacated in part on other grounds, Iowa Utils. Bd. v. FCC, 120 F.3d 753 (8th Cir. 1997), rev'd in part sub nom. AT&T v. Iowa Utils. Bd., 525 U.S. 366 (1999).  See also, Jonathan E. Nuechterlein and Philip J. Weiser, Digital Crossroads: American Telecommunications Policy in the Internet Age 422 (2007) ("[T]he 1996 Act largely displaced the traditional mode of dual jurisdiction, which divides the *subject matter* of telecommunications regulations into mutually exclusive federal and state spheres, with a new model of cooperative federalism in which the FCC and the states often work together in complementary roles on the same subject matter.").

Turning now to conflict preemption, the Court finds it similarly inapplicable for four compelling reasons.  As stated above, Verizon Access argues that the SCC's Orders conflict with

the FCC's Hyperion Order and with the FCC's Order approving the merger of Verizon and MCI. First, the "filed rate doctrine" is not relevant to the instant proceedings.  Section 203 of the Communications Act requires telecommunications carriers to file with the FCC tariffs showing their charges, practices, classifications, and services.  47 U.S.C. § 203.  "To ensure that all service providers and their customers complied with the tariff, courts developed the 'filed rate doctrine,' which prohibited a regulated entity from charging rates for its services other than those specified in its duly filed tariff."  Ting v. AT&T, 319 F.3d 1126, 1131 (9th Cir. 2003).

In Hyperion, the FCC jettisoned this mandatory tariff filing requirement for non-ILEC telecommunications service providers of interstate access services.  The FCC determined that "mandatory tariff filing requirements for non-ILEC providers of interstate exchange access services are unnecessary to assure that rates for interstate access services provided by these carriers are just and reasonable and not unjustly or unreasonably discriminatory."  12 FCC Rcd at 8608.  The  non-ILEC access providers' lack of market power, reasoned the FCC, would "preclude [them] from charging unreasonable rates for interstate exchange access."  Id. at 8608–09.

The complete assimilation of MCI, a CLEC, by Verizon, an ILEC, naturally changes the landscape.  Although it remains an open question whether the FCC would apply Hyperion to a post-merger MCI, it is quite clear, however, that it was the potential for anticompetitive consequences recognized by all three relevant regulating entities, that inspired the special access conditions mandated by the SCC and FCC.  Indeed, the special access condition adopted by the FCC, although initially volunteered by Verizon, was made a mandatory condition of the merger precisely because market forces were deemed insufficient.  See FCC Order at 18435.  In any event, as the Eighth Circuit stated in Qwest, "the filed tariff doctrine does not apply in this case,

because the doctrine addresses the relationship between a carrier and its customers, not the relationship between a carrier and a regulator."  380 F.3d at 375.

Second, the SCC's condition is not in conflict with the FCC's condition.  There are essentially four material differences between these two conditions.  The FCC's price controls apply: (1) for thirty months; (2) to rates; (3) to existing MCI customers; and (4) to DS1 and DS3 services.  The SCC's price controls, however, apply: (1) indefinitely; (2) to rates, terms, and conditions of service; (3) to both new and existing MCI customers; and (4) to all special access services and high capacity loop and transport services.  Although noticeably more stringent, the SCC's condition is not inconsistent with the FCC's condition.  "Inconsistency requires more than a variance between state and federal law.  [The state] regulation must actually conflict with the [federal regulation] in order to be deemed inconsistent with it."  Nat'l Tank Truck Carriers, Inc. v. Burke, 535 F. Supp. 509, 514–15 (D. R.I. 1982).  What is more, the fact that a state regulation "proscribes certain behavior considered legal under the [federal regulation] is not dispositive" because states are "free to impose more restrictive standards than the federal standards."  Chanoff v. U.S. Surgical Corp., 857 F. Supp. 1011, 1015 (D. Conn. 1994) (internal quotation marks omitted).

Verizon Access does not dispute that it is able to comply with both conditions.  It does, however, maintain that the SCC's condition stands as an obstacle to the accomplishment of federal objectives.  Specifically, it asserts that the SCC's condition conflicts with the policy judgments made by the FCC and DOJ in their respective approvals of the merger.  As Verizon Access's argument goes, in approving the merger of Verizon and MCI, the FCC struck a specific balance between competition and regulation that it found necessary to ensure that the merger served the public interest.  Because that balance concerns the proper degree of regulation of rates,

terms, and conditions for an interstate telecommunications service, it is a federal policy decision with preemptive effect.  Unfortunately for Verizon Access, this line of reasoning is forestalled by the FCC's determination in <u>Local Competition</u> that the 1996 Act alters the dual regulatory framework of the Communications Act, and expands the applicability of both national rules to historically intrastate issues, and state rules to historically interstate issues.  11 FCC Rcd at 15544.

Third, the FCC in its Order expressly disclaimed any intent to preempt state regulations that are "not inconsistent" with the conditions therein.  In Appendix G of its Order, the FCC proclaimed that

> [i]t is not the intent of these Conditions to restrict, supersede, or otherwise alter state or local jurisdiction under the Communications Act of 1934, as amended, or over the matters addressed in these Conditions, or to limit state authority to adopt rules, regulations, performance monitoring programs, or other policies that are not inconsistent with these Conditions.

FCC Order at 18559.  Generally, an agency's "statement is dispositive on the question of implicit intent to pre-empt unless either the agency's position is inconsistent with clearly expressed congressional intent, or subsequent developments reveal a change in that position."  <u>Hillsborough County v. Automated Med. Labs., Inc.</u>, 471 U.S. 707, 714 (1985) (internal citation omitted).  As noted above, the SCC condition is not inconsistent with the FCC condition.  Accordingly, it is not preempted by the FCC Order.  Moreover, the FCC's use of the disjunctive "or" in the above-quoted clause means that it intended the states to have authority over all matters reserved to the states by the Communications Act, as amended, as well as over matters which are not reserved to the states by the Act, but which do appear in the Conditions.

Finally, and of considerable significance, the FCC had actual knowledge of the SCC's condition when its Order was issued.  On October 7, 2005, Counsel for XO informed the legal

11

advisors to Commissioner Michael J. Copps and Commissioner Kathleen Q. Abernathy that the SCC issued its Order the day before, and alerted them to the SCC's special access condition. Notice of Ex Parte Communications filed by XO Communications, Inc., Oct. 7, 2005, available at http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518167069. This meeting took place three weeks before the FCC Order was adopted.  Armed with this knowledge, if the FCC had any concerns about the substance of the SCC's condition, it would have made them known.  The FCC is generally not shy about defending its territory.  Its continued silence in the wake of this litigation, therefore, is quite telling.

## IV.

For the foregoing reasons, the Motions to Dismiss are GRANTED, and Plaintiff's Complaint is hereby dismissed with prejudice.  An appropriate Final Order shall issue.


_____/s/_____
James R. Spencer
CHIEF UNITED STATES DISTRICT JUDGE


ENTERED this 27th day of March 2007